UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| LORI R. DUNAHEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  4:11CV2218 TIA |
| | ) | |
| CAROLYN W. COLVIN,[1] | ) | |
| ACTING COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court under 42 U.S.C. § 405(g) for judicial review of the denial

of Plaintiff's application for Disability Insurance Benefits under Title II of the Social Security Act.

The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

**I.  Procedural History**

On January 17, 2007, Plaintiff filed an application for Disability Insurance Benefits,

alleging that she became unable to work on July 1, 2006 due to depression, fibromyalgia, arthritis,

lower back pain, chronic fatigue, migraines, stress, and hypothyroidism.  (Tr. 11, 211-18, 125)

The application was denied on May 17, 2007, after which Plaintiff requested a hearing before an

Administrative Law Judge ("ALJ").  (Tr. 103-04, 125-29, 131)   On March 12, 2008, Plaintiff

testified at a hearing before the ALJ.  (Tr. 23-49)  In a decision dated April 18, 2008, the ALJ

found that Plaintiff had not been under a disability from July 1, 2006 through the date of the

decision.   (Tr. 109-18)  On September 12, 2008, the Appeals Council granted Plaintiff's request

---

[1]  Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14,
2013.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is
substituted for Michael J. Astrue as the Defendant in this action.

for review and remanded the case to the ALJ for resolution of issues specified in the order. (Tr. 122-24) The ALJ conducted a supplemental hearing on May 19, 2010 and issued a new decision on October 29, 2010, finding Plaintiff not disabled. (Tr. 11-17, 50-102) The Appeals Council denied Plaintiff's request for review on November 2, 2011. (Tr. 1-3) Thus, the decision of the Appeals Council stands as the final decision of the Commissioner.

## II. Evidence Before the ALJ

At the second hearing before the ALJ, Plaintiff was represented by counsel. The ALJ first notified Plaintiff's attorney that he would keep the record open for 30 days to submit medical or any other relevant evidence. The ALJ then questioned Plaintiff, who testified that she was married but had been separated for six months. Plaintiff was 44 years old and lived alone in a trailer. She had six cats. Her husband previously lived with her in the trailer but left because he was tired of her complaining. Plaintiff stated that she finished 10th grade. She tried to get her GED but was unsuccessful . Plaintiff weighed 205 pounds and measures 5 feet 5 inches. Her heaviest weight was 305, but she was losing after having gastric bypass surgery. Plaintiff had no income. Her family helped pay bills, and she received food stamps and Medicaid. (Tr. 52-61)

Plaintiff further testified that she last worked as a home care aide from 2002-2006. Her responsibilities included bathing patients, administering medication, cleaning patients' homes, and cooking. From 1999-2002 Plaintiff worked as a shift manager at Captain D's, working the cash register and cleaning. Plaintiff also worked as a school bus driver and a part-time cashier at Wal-Mart. (Tr. 61-65)

Plaintiff stated that she had fibromyalgia, which Dr. Sandra Hoffman diagnosed. Plaintiff presently sought treatment from her primary care doctor, Dr. Dwayne Holton. Plaintiff last saw

Dr. Hoffman in 2006, but she testified that she was seeing a new rheumatologist, Dr. Gosch. Plaintiff's fibromyalgia symptoms included extreme pain when lightly touched. The pain was from head to toe. Plaintiff had taken Cymbalta for her symptoms, but she currently took Savella, which worked the best so far. Plaintiff had difficulty getting medication and treatment without insurance. (Tr. 65-68)

Plaintiff also experienced migraines. She stated that she took Topamax in the past when she had insurance but had to stop taking the medication due to lack of funds. However, over the past year, the migraines seemed to have resolved. Plaintiff additionally testified regarding chronic fatigue. She did not take medication for the fatigue. Further, Plaintiff took Zantac for ulcers, which resulted from her gastric bypass surgery. (Tr. 68-70)

Plaintiff testified that she had back problems, including degenerative disc disease and a bulging disc. She had not undergone back surgery, but her pain management doctor advised her that she should see a surgeon. Plaintiff saw Kevin Coleman at Millennium Pain Management once a month for injections. Plaintiff's pain medications included Duragesic, Pantanol, patches, and Oxycodone. Plaintiff recently underwent an MRI, but the results were not in the medical records. She also had an upcoming appointment for knee x-rays. Plaintiff also testified that she was diagnosed as bipolar. She was seeing a psychologist at the free clinic, but after 2 missed appointments, the clinic refused to see her again. Plaintiff was having difficulty finding another clinic that took new patients and Medicaid. However, she continued to receive prescription refills through her primary care physician. (Tr. 70-75)

On a typical day, Plaintiff got up around seven or eight o'clock, drank coffee all day, and ate a sandwich or microwave meal around noon. She usually at a microwave meal for dinner

unless her daughter, who lived in a trailer next door, brought over a meal. Plaintiff did not have any friends in the trailer court. Plaintiff sometimes watched her seven-year-old granddaughter after school. She also visited with her eighteen-month-old grandson when her daughter brought him over. She did not visit with her grandkids alone. Plaintiff used to go to church but stopped two years ago because she had trouble leaving the house, and she felt as though people judged her. (Tr. 75-78)

Plaintiff stated that her medications caused drowsiness and made her lose her train of thought. Plaintiff last smoked six years ago. She previously drank alcohol casually but stopped drinking after her gastric bypass. She had a driver's license and drove around town to the grocery store, where she purchased TV dinners. Her daughter purchased 3 ½ pound bags of cat food. Additionally, Plaintiff's mother drove her to doctor's appointments because Plaintiff fell asleep behind the wheel after fifteen minutes of driving. Plaintiff no longer cooked full meals. She ate from microwave trays and only washed a glass. Plaintiff further testified that she attempted to do her own laundry. Her daughter did the vacuuming, and her daughter's husband or her son took care of the yard. Plaintiff had no hobbies. She owned a computer and previously did a lot of shopping on ebay, resulting in debt accumulation. Plaintiff had a Facebook account as well. (Tr. 78-83)

Plaintiff stated that she could go halfway through a ten minute grocery trip before needing to sit down. She could stand about ten minutes and sit about fifteen to twenty minutes. Plaintiff could lift about ten pounds. She could hold her eighteen-month-old grandson in her lap, but she could no longer lift him. (Tr. 83-84)

Plaintiff's attorney also questioned Plaintiff during the hearing. Plaintiff stated that she received food stamps and two hundred dollars a month. Her memory problems affected her reading in that she could not remember a paragraph she just read. She had similar problems in school but never attended special education classes. Plaintiff also had difficulty interacting with people in public, and she talked back a lot to previous supervisors. She did not like job assignment changes, and she noted problems remembering her duties. Plaintiff also fell asleep during work. Plaintiff took Xanax for anxiety attacks, which she described as feeling like she was going to have a heart attack and throw up. She also took Flexiril for muscle spasms in her neck and back and Ambien for sleep. Plaintiff testified that she slept a couple times during the day due to her pain medications. Plaintiff previously took Neurontin for pain and was currently taking Oxycodone. She also took Valproic Acid for bipolar disorder. Plaintiff was unable to remember all her medications. (Tr. 84-90)

Plaintiff further stated that she could not return to work as a cashier at Wal-Mart or Captain D's because she did not like people, and counting change and standing would be hard. In addition, she could not return to Reliable Home Care because she fell asleep during the day and could not deal with the ladies. She believed she could work a job with a sit/stand option for six to eight hours a day if she could take a nap for two to three hours. (Tr. 90-91)

Plaintiff stated that she experienced pain from head to toe. Although she no longer had migraines, she did experience head aches, which she described as throbbing in her temples and feeling like she had been punched across her face. The worst pain was in her neck, back, lower back, hips, and right leg. Dr. Coleman burned the nerves on the right side of her hip and planned to do the left side as well. She rated her low back pain as a nine, on a scale of one to ten.

Sometimes the pain was a seven or eight. She described her hip pain as feeling like her hips were in a vice grip being squeezed. The sharp, shooting pains radiated down her legs, which were numb and throbbing. Plaintiff's neck also hurt due to bulging discs. She was unable to lift a cup of coffee, and the pain felt like a tearing in her neck that went down to her shoulders and arms. She had dropped glasses in the sink when washing them. With regard to depression, Plaintiff stated she did not care if she woke up. She had thoughts of suicide and did not care about life. Plaintiff cried all the time. (Tr. 91-94)

A vocational expert ("VE") also testified at the hearing. The VE listed Plaintiff's jobs with skill and exertional levels over the past fifteen years as fast food worker, light, unskilled; retail cashier, light semi-skilled; and convenience store clerk, light, unskilled. Plaintiff had also acquired skills that she could utilize as a cashier in customer service. The ALJ then asked the VE to assume a hypothetical individual with Plaintiff's education, training, and work experience who could work at the light exertional level. The person could climb stairs and ramps occasionally; could never climb ropes, ladders, or scaffolds, stoop; and could stoop, kneel, crouch and crawl occasionally. She could understand, remember, and carry out at least simple instructions and non-detailed tasks; demonstrate adequate judgment to make simple work-related decisions; respond appropriately to supervisors and co-workers in a task-oriented setting where contact with others is casual and infrequent; adapt to simple routine work changes; and perform repetitive work according to set procedure, sequence, and pace. Given this hypothetical, the VE testified that the individual would be unable to perform any of Plaintiff's past jobs. However, she could work as a bench assembler and housekeeper, cleaner. (Tr. 95-98)

For the second hypothetical, the ALJ stayed with light exertion and no change in stooping, kneeling, or crouching. The individual required a sit/stand option with the ability to change positions frequently. She could understand, remember, and carry out at least simple instructions and non-detailed tasks; maintain concentration and attention for two hour segments over an eight hour period; respond appropriately to supervisors in a task-oriented setting where contact with others was casual and infrequent; and perform repetitive work according to set procedure, sequence, and pace. The Ve responded that the individual could work as a bench assembler and a surveillance systems monitor. (Tr. 98-99)

The last hypothetical added modifications of an inability to maintain concentration and attention for two hour segments over and eight hour period; the need to take two additional breaks beyond the normal two breaks and lunch because of fatigue; and a need to have daily crying spells. The VE testified that these changes would preclude competitive employment. (Tr. 99)

Plaintiff's attorney also questioned the VE, asking whether the individual could perform the jobs mentioned by the VE if she had to lay down for two hours a day or suffered from pain and could not concentrate. The VE responded that those positions would be eliminated with those additional restrictions. (Tr. 100)

In a Disability Report – Adult, Plaintiff reported that she could not take care of her self like she used to. She experienced pain when putting on clothing, standing longer than 5 minutes, and sitting longer than 15 minutes. She could not get a full night's sleep, and she was tired and cried during the day. She could not remember things, and she could barely lift 15 pounds. (Tr. 241-52)

In a Function Report – Adult, Plaintiff stated that during a typical day, she woke up; took her medication; woke up her son to help her put on her clothes; rested for an hour; tried to walk on the Gazelle but could not walk for more than three minutes; tried to do housework but could only dust one or two shelves; and spent the rest of the day crying and wishing she had not gotten up. Plaintiff did not need reminders to take care of personal needs or to take medication. She was able to cook TV dinners and make sandwiches two to three times a week and could put in a load of laundry and fold the clothes. Plaintiff shopped for groceries and clothes and reported that she spent about 1 to 1 ½ hours shopping. She had no problems getting along with others. Her conditions affected her ability to lift, stand, walk, sit, kneel, stair climb, and concentrate. She could only lift 10 to 15 pounds; stand and walk for 5 minutes; sit for 15 minutes; and climb one flight of stairs. She also had trouble concentrating. Plaintiff was able to follow written and spoken instructions; had no problems getting along with authority figures; and handled changes in routine okay. (Tr. 263-70)

Plaintiff's son also completed a Function Report Adult – Third Party. He stated that he helped Plaintiff with housework, driving, and personal care. Plaintiff was able to make a sandwich two to four times a week, as well as dust and do one load of laundry for about 10-15 minutes three times a week. Her conditions affected her ability to lift, sit, stair climb, bend, stand, and walk. She also displayed anxiety and talked about dying. (Tr. 279-85)

### III. Medical Evidence

Dwayne Helton, D.O., examined Plaintiff on November 24, 2006, for complaints of continued malaise, weight gain and joint pain. She reported she was unable to work and specifically complained of severe left elbow pain. Plaintiff weighed 336 pounds. Musculoskeletal

exam showed diffuse joint tenderness to palpation. Dr. Helton assessed malaise, migraine cephalgia, hypothyroidism, chronic lumbago, arthralgias, generalized anxiety disorder, ADD, and morbid obesity. He recommended that Plaintiff see a rheumatologist. (Tr. 373)

On December 28, 2006, Dr. Sandra Hoffman, a rheumatologist, examined Plaintiff. Dr. Helton referred for polyarthralgias due to pain in both hips, her left knee, low back, and left elbow. Plaintiff's current weight was 346 pounds with a 100 pound weight gain over the last few months. She also reported feeling fatigued. Review of systems indicated weight gain, fatigue, weakness, double or blurred vision, pain in chest, high blood pressure, shortness of breath, swollen legs, cough, stomach pain, heartburn, muscle pain, joint pain, muscle weakness, nodules, muscle spasms, sensitivity or pain in hands, anxiety, depression, agitation, and difficulty falling asleep. Dr. Hoffman noted multiple fibromyalgia trigger points along with cervical and thoracic area on examination. She assessed left tennis elbow, fibromyalgia, and degenerative arthritis. (Tr. 337-38)

Dr. Helton evaluated Plaintiff for complaints of migraines, arthralgias, and hyperthyroidism on January 10, 2007. Dr. Helton noted that Plaintiff had full active and passive range of motion in all extremities. She had tenderness of the cervical, thoracic, and lumbar paraspinal musculature. Dr. Helton assessed migraine cephalgia, hypothyroidism, chronic lumbago, general anxiety disorder, ADD, osteoarthritis of the lumbar spine and hip/pelvis, fibromyalgia, and goiter. He ordered a endocrinology consult. (Tr. 372)

Joseph Long, Ph.D, a clinical psychologist, saw Plaintiff on May 10, 2007 at the request of Disability Determinations. Plaintiff reported that she applied for disability on the basis of depression and fibromyalgia. Dr. Long noted Plaintiff's sad demeanor and circles under her eyes

which made her seem older. Here mood was morose, and Dr. Long estimated her intelligence to be in the average to low average range. Plaintiff stated she had been depressed her entire life. She had been hospitalized in the 90s after a suicide attempt, and she reported daily crying spells and fantasies of cutting herself or driving off the road. Plaintiff had a hard time falling asleep and slept fitfully. Plaintiff's daily routine consisted of laying in bed until she could get up, then she was ready for a nap. Her son helped her around the house and with personal grooming. She watched a lot of court TV but had no hobbies or social activities. Dr. Long assessed Dysthymic Disorder, ADHD by history, probably pain disorder with both psychological and medical factors, personality disorder, NOS/borderline diagnosis by history. He noted that Plaintiff was not impaired in her ability to understand and remember instructions; moderately impaired in her ability to sustain concentration and persist with tasks; and moderately to markedly impaired in social and adaptive functioning. (Tr. 441-43)

Plaintiff presented to the emergency room of St. John's Mercy Hospital in Washington, Missouri on May 13, 2007, due to recurrent headaches. She was released after medication relieved the symptoms. (Tr. 776-77)

Dr. Sandra Hoffmann saw Plaintiff for a rheumatology follow up on May 22, 2007. Plaintiff reported experiencing severe arthritic problems with her knees which were based largely on her weight exceeding the 350 pound limit of their scale. Plaintiff also reported problems with both hips, particularly on the left side radiating down the leg in a sciatic nerve distribution, as well as problems in the left elbow. Plaintiff took Paxil for stress, Percocet for pain, and Ambien for chronic insomnia. Dr. Hoffmann suspected a component of sleep apnea. Dr. Hoffmann referred the Plaintiff to Dr. Malik, for probable significant depression, and to Dr. Eagon, for weight loss

surgery. Dr. Hoffmann opined that weight loss surgery was the only thing that would help

Plaintiff, as she was "eating herself into a crippled state and ultimately eating herself to death."

Dr. Hoffmann believed that insurance should cover the surgery on medical grounds, as Plaintiff

had significant secondary medical problems. (Tr. 1090)

On July 11, 2007, Plaintiff saw Dr. Helton, who noted that Plaintiff had been approved for

gastric bypass. (Tr. 953)  Dr. Norbert Richardson evaluated Plaintiff on August 16, 2007, due to

her morbid obesity.  Plaintiff denied any headaches or neck pain.  She had no tenderness of the

extremities.  Dr. Richardson assessed morbid obesity refractory to medical management with co-

morbid conditions; sleep apnea requiring C-PAP; fibromyalgia; osteoarthritis; and

gastroesophageal reflex disease.  He planned to proceed with laparoscopic Roux-en-Y divided

gastric bypass.  (Tr. 534-35)

Plaintiff was admitted to St. Alexious on September 5, 2007, for laparoscopic Roux-en-Y

divided gastric bypass.  Plaintiff's post operative diagnoses were morbid obesity refractory to

medical management with co-morbid conditions; sleep apnea requiring C-PAP; fibromyalgia;

osteoarthritis; gastroesophageal reflex disease; and abdominal wall pain. (Tr. 529-31)

 Plaintiff saw Dr. Helton on September 18, 2007 and noted that Plaintiff had lost 30

pounds since her gastric bypass on September 5. (Tr. 951)  On September 30, 2007, Plaintiff

presented to the emergency room of St. John's Mercy Hospital in Washington, Missouri due to

abdominal discomfort since her gastric bypass procedure.  She reported nausea, and inability to

tolerate even oral water, and diarrhea the past two days. (Tr. 539)

Plaintiff returned to Dr. Helton on October 16, 2007, for a follow up exam.  Dr. Helton

noted that the hospital recently diagnosed Plaintiff with a gastric ulcer.  He assessed

hypothyroidism and lumbago and planned to continue pain control. Dr. Helton prescribed

Percocet. He also noted that Plaintiff had lost 53 pounds since her gastric bypass. (Tr. 950)

Plaintiff followed up with Dr. Richardson on October 29, 2007. Dr. Richardson noted

that Plaintiff underwent an upper endoscopy one month ago, which revealed an ulcer of the

gastrojejunostomy site. Plaintiff initially improved but reported developing recurrent symptoms

and difficulty swallowing two days ago. Physical examination was normal. Dr. Richardson

assessed epigastric abdominal pain with nausea consistent with persistent marginal ulcer or

possible stricture. (Tr. 517)

Plaintiff returned to Dr. Helton on November 13, 2007 for follow up. She reported doing

well and had no new concerns or complaints. (Tr. 949) On December 4, 2007, Dr. Helton

examined Plaintiff for complaints of back pain radiating down her right leg and into her foot, as

well as into her buttocks bilaterally. She also needed prescription refills and a B12 shot. Dr.

Helton noted diminished sensation to pinprick in L4 right and L4/L5 left with weak great toe on

the left. (Tr. 948)

Plaintiff underwent an MRI on December 6, 2007, which showed minimal disk bulging

and facet osteoarthritis at L4-5. At L5-S1, there was asymmetric bulging to the left with small

protrusion of questionable significance. In addition, the MRI revealed mild right foraminal

narrowing at L5-S1 and facet osteoarthritis at L5-S1, right more than left. (Tr. 1030) On

December 18, 2007, Plaintiff recieved a L5-S1 right epidural steroid injection and tolerated the

procedure well. (Tr. 568) She received a second injection on January 8, 2008, after complaining

to Dr. Helton on January 2, 2008 of low back pain that ranged from a five to an eight on a scale

of one to ten. (Tr. 567, 947)

On January 12, 2008, Plaintiff presented to the ER at St. John's Mercy Medical Center Emergency Room, complaining of mid back pain for the last three days. An x-ray of the thoracic spine showed well-maintained vertebral body heights. Endplate degenerative changes and anterolateral osteophytes were present, but not lytic or abnormality. There was no evidence of paraspinous masses. (Tr. 922-39)

Plaintiff returned to Dr. Helton on February 19, 2008, with complaints of low back pain and frequent headaches. She stated that the two epidural injections helped a little and that the pain was not radiating down her leg as bad. She had not yet gone to physical therapy. Dr. Helton assessed headache and lumbago, prescribed medication, and wrote prescriptions for a 3rd injection, a dexa scan, and physical therapy. (Tr. 1064) On February 28, 2008, Plaintiff underwent a L4-5 epidural steroid injection. (Tr. 566)

Plaintiff saw Dr. Helton on March 25, 2008. She complained of experiencing gastric pain every time she ate but had not refilled her Prevacid since December. She started physical therapy but stated that her low back pain was worse. Dr. Helton planned to refer Plaintiff for an orthopaedic spine consultation. (Tr. 1062) On April 18, 2008, Plaintiff told Dr. Helton that she was having problems with anxiety again. She was still experiencing a lot of back pain, which kept her from enjoying her weight loss success. Xanax no longer controlled her anxiety attacks. (Tr. 1060-61)

On May 20, 2008, Plaintiff informed Dr. Helton that she had seen a neurologist, who recommended that Plaintiff return to physical therapy. However, Plaintiff stated that her insurance would not pay. She also complained of leg numbness, which made it difficult for her to drive to and from work or drive a vehicle as a job. She also complained of increasing depression.

Dr. Helton prescribed Lexapro, Citalopram, Percocet, and Xanax. (Tr. 1058-59)

Plaintiff's mood was a little better on June 24, 2008. She had no new complaints or concerns, other than continued back pain which she rated as a three or four out of ten. She also reported frequent muscle spasms in her back. (Tr. 1056-57)

Plaintiff returned to Dr. Helton on August 20, 2008. She was doing fairly well and had no new complaints or concerns. She reported that Neurontin helped with her back pain but not with leg and hip pain. She also reported years of mood swings and impulsive spending, causing her family to thinks she was bipolar. (Tr. 1052) On October 15, 2008, Plaintiff complained of cold symptoms. In addition, she stated her mood highs had been well controlled since starting Valproic Acid, although her appetite had increased. She was trying to get a pain management appointment with Dr. Coleman. (Tr. 1049)

On October 28, 2008, Dr. Kevin Coleman at Pain Management Services evaluated Plaintiff for complaints of pain. Plaintiff was in no acute distress, and she did not exhibit any signs of undue depression, anxiety, or agitation. Dr. Coleman assessed L4-5 and L5-S1 bilateral facet arthritis; L5-S1 disc protrusion; L5-S1 right foraminal narrowing; and myofascial pain. He noted that Plaintiff signed an Opioid Consent and Agreement. Dr. Coleman also ordered further testing and prescribed medications. (Tr. 1097-1107) Dr. Malik Ahmed examined Plaintiff on June 9, 2009. Dr. Ahmed noted that Plaintiff had a depressed and nervous mood with an anxious affect. He diagnosed bipolar disorder II, anxiety disorder NOS. (Tr. 1140-41)

Plaintiff returned to Dr. Coleman at the pain clinic on June 12, 2009. Plaintiff complained of pain in her low back and mid hip, which she described as shooting and sharp. The pain was also severe and constant. She reported that the medications relieved her pain 75%. Dr. Coleman

assessed lumbar radicular pain, myofascial pain, and lumbar degenerative arthritis. He refilled her medications and advised her to return in one to two months. (Tr. 1215-16) On August 3, 2009, Plaintiff complained of pain in her neck, hips, and mid back. She described the pain as shooting, tearing, burning, nauseating, moderate, and constant, but mostly in the evening. Medication relieved the pain 60%. She had tenderness of the left C4 through C5 and mild tenderness in the left trapezius muscle. Dr. Coleman assessed cervicalgia, cervical radicular pain, myofascial pain, lumbar degenerative disc disease, and lumbar radicular pain. He planned to continue Methadone and Roxicodone for breakthrough pain and ordered an x-ray. (Tr. 1216-19)

Plaintiff saw Dr. Helton on September 29, 2009, for a follow up exam. She was doing well overall but complained she was still moody and had no energy. Her husband would not go to Wal-Mart with her anymore because she yelled at people. She was sleeping well with Ambien. (Tr. 1151-52)

On November 12, 2009, Dr. Coleman noted that Plaintiff was tender over the bilateral sacroiliac joints. He performed a bilateral sacroiliac joint injection on Plaintiff and added Fentanyl patches. (Tr. 1222-24)

Plaintiff saw Dr. Helton on December 22, 2009. Dr. Helton noted that Plaintiff began gaining weight after her pain management doctor prescribed pain patches. Dr. Helton assessed malaise and myalgia. (Tr. 1146-47)

On January 11, 2010, Plaintiff complained of pain in the right hip and back. Dr. Coleman noted tenderness in the bilateral lumbar paraspinal muscles and tenderness over the bilateral sacroiliac joints. Dr. Coleman conducted a lumbar sacral nerve radiofrequency ablation. He also

prescribed Duragesic and Roxiocodone, ordered a liver function profile and MRI, and advised Plaintiff to return in two weeks. (Tr.1225-26)

Dr. Sanjay Ghosh evaluated Plaintiff on January 25, 2010, at the request of Dr. Helton. Plaintiff complained of constant moderate dull pain in her hands, elbows, knees, hips, and low back for a year. The pain was increased by exertion and decreased by nothing. Morning stiffness lasted several hours. Dr. Ghosh noted tenderness in the cervical and lumbar spine; no tenderness in the thoracic spine, ribs, or pelvis; normal gait and station; tenderness with trace swelling in elbows, knees, ankles, and wrists with normal range of motion; nontender shoulders and hips; normal muscle strength and tone; 8/18 tender points. Dr. Ghosh assessed inflammatory arthritis, fibromyalgia, and low back pain. Plaintiff returned to Dr. Ghosh again on March 2, 2010, who noted that Plaintiff still had symmetrical poly arthritis. (Tr. 1207)

On February 16, 2010, Plaintiff saw Dr. Joseph Long for a second time, at the request of Disability Determinations. Dr. Long took a clinical history, and Plaintiff complete the Minnesota Multiphasic Personality Test – 2. Dr. Long noted that Plaintiff walked with a slow gait. Plaintiff described her mood as usually depressed and stated that she cried all the time and hated people. Dr. Long stated that Plaintiff's mood during the exam was generally depressed and anxious. Her range of affect was constricted and had a distinct negative quality. He estimated her intellect to be in the low average to average range. (Tr. 1134)

Dr. Long further noted that Plaintiff generated a valid MMPI-II clinical profile. The elevated F scale was seen among individuals who were very dissatisfied, moody, sullen, and overly critical of themselves and others. The profile was also elevated on Scales 8-2-1, indicating depression, anxiety and agitation, along with a significant level of distress about physical

16

symptoms with an underlying psychological component. This type personality was typically unsociable and overwhelmed by physical and emotional concerns. Dr. Long stated that physical complaints often exceeded documented medical diagnostic tests. However, individuals with this profile had no insight into their somatizing. Dr. Long assessed bipolar mood disorder/depressed; dysthymic disorder; ADHD by history; pain disorder associate with both psychological factors and general medical conditions; and personality disorder, NOS with avoidant and borderline features. (Tr. 1136-37)

Dr. Long also completed a Medical Source Statement of Ability to do Work-Related Activities (Mental). He noted that Plaintiff had a "marked" level of impairment with regard to interacting appropriately with the public, interacting appropriately with supervisors, interacting appropriately with coworkers, and responding appropriately to usual work situations and to changes in a routine work setting. She had moderate impairments in carrying out complex instructions and making judgments on complex work-related decisions. Dr. Long opined that Plaintiff would likely overreact to routine demands and may well develop more somatic complaints as pressures rise. (Tr. 1131-32)

Plaintiff returned to Dr. Coleman on March 8, 2010, complaining of pain in the neck, knees, and hips. Dr. Coleman noted that Plaintiff's x-rays of the lumbar spine showed narrowing of the L4-5 and L5-S1 spaces. He also noted that Plaintiff was diagnosed with rheumatoid arthritis since her last visit. Dr. Coleman assessed lumbar degenerative disks disease, lumbar radicular pain, right sacroiliitis, cervical degenerative disk disease, cervical bulging disks at C3-4, cervicalgia, cervical radicular pain, and headaches. (Tr. 1233-34)

An MRI of Plaintiff's lumbar spine conducted on March 15, 2010 revealed broad based disk bulges at L4-5 and L5-S1 with accompanying facet arthropathy resulting in bilateral neuroforaminal encroachment most pronounced on the right at L5-S1. The test showed no central canal compromise. (Tr. 1235)

On March 24, 2010, Dr. Helton examined Plaintiff for a follow up on her anxiety and depression. Plaintiff's weight was stable, and she was sleeping well. Her complaint was depression, and she reported frequently crying over nothing. When she was not crying she was agitated and angry. Dr. Helton assessed bipolar affective disorder and hypothyroidism. He started Plaintiff on a trial of Savella for depression and Seroquel XR 50 for mania and agitation. (Tr. 1145)

When Plaintiff returned to Dr. Helton on April 8, 2010, she indicated that she could not find a psychiatrist who took her insurance to evaluate her for ADD/ADHD. Plaintiff also complained of abdominal pain. Dr. Helton assessed irritable bowel syndrome. Plaintiff also signed a release for prior mental health records. If Plaintiff had a diagnosis for ADHD, Dr. Helton would prescribe treatment. (Tr. 1143)

Plaintiff saw Dr. Ghosh on April 28, 2010. Plaintiff was doing better with Plaquenil and Methotrexate and had decreased pain in the hands and knees. Her low back still hurt, and morning stiffness lasted a half hour. Dr. Ghosh noted only mild tenderness in the right 4th and 5th MCPs and in the cervical and lumbar spine. He assessed inflammatory arthritis, fibromyalgia, and lumbago and prescribed medications. (Tr. 1211-12)

On May 6, 2010, Plaintiff reported 50% improvement with medication and 90% improvement with procedure. Dr. Coleman administered a cervical epidural steroid injection. (Tr. 1237-38)

## IV. The ALJ's Determination

In a decision dated October 29, 2010, the ALJ determined that Plaintiff met the insured status requirements of the Social Security Act on July 1, 2006 and remained insured throughout the period of the ALJ's decision. The ALJ found that Plaintiff had not engaged in substantial gainful activity since July 1, 2006. She had the following severe impairments: degenerative disc disease; fibromyalgia; obesity; bipolar disorder; dysthymic disorder; and a personality disorder. However, her condition did not meet or medically equal a listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ determined that Plaintiff's alleged impairments of migraine headaches, hypothyroidism, and ulcers were not severe. (Tr. 13-14)

The ALJ further found that, since July 1, 2006, Plaintiff had the residual functional capacity ("RFC") to perform light work, except she required a sit/stand option with the ability to change positions frequently. She was able to understand, remember, and carry out at least simple instructions and non-detailed tasks; maintain attention and concentration for two-hour segments over and eight-hour period; respond appropriately to supervisors in a task-oriented setting where contact with others, including co-workers, was casual and infrequent; and perform repetitive work according to set procedures, sequence, or pace. The ALJ noted that this RFC constituted a limited range of unskilled light work. The ALJ determined that Plaintiff was unable to perform her past relevant work. However, in light of her younger age, 10th grade education, and RFC, the ALJ found that a significant number of jobs existed in the national economy which Plaintiff

could perform.  Such jobs included a bench assembler and surveillance system monitor.

Therefore, the ALJ concluded that Plaintiff was not disabled under the Social Security Act.  (Tr. 14-17)

## V.  Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability.  42 U.S.C. § 423(a)(1).  The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months."  20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process.  See 20 C.F.R. § 404.1520(b)-(f).  Those steps require a claimant to show: (1) that claimant is not engaged in substantial gainful activity; (2) that she has a severe impairment or combination of impairments which significantly limits her physical or mental ability to do basic work activities; or (3) she has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) she is unable to return to her past relevant work; and (5) her impairments prevent her from doing any other work.  Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence.  42 U.S.C. § 405(g).  "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'"  Cruse v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)).  The Court does not re-weigh the evidence or review the record de novo.  Id. at 1328 (citing Robert v.

Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount a plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that she considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to

plaintiff's complaints under the <u>Polaski</u>[2] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. <u>Benskin v. Bowen</u>, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. <u>Marciniak</u>, 49 F.3d at 1354.

## IV. Discussion

In her Brief in Support of the Complaint, Plaintiff asserts that substantial evidence does not support the ALJ's RFC determination because the finding failed to adopt the opinions of Dr. Long. Defendant, on the other hand, contends that the ALJ properly discounted the opinion of Dr. Long and properly assessed Plaintiff's credibility in determining her RFC. The undersigned agrees with the Defendant.

With regard to residual functional capacity, "a disability claimant has the burden to establish her RFC." <u>Eichelberger v. Barnhart</u>, 390 F.3d 584, 591 (8th Cir. 2004) (citation omitted). The ALJ determines a claimant's RFC "'based on all the relevant evidence, including medical records, observations of treating physicians and others, and [claimant's] own description of her limitations.'" <u>Page v. Astrue</u>, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting <u>Anderson v. Shalala</u>, 51 F.3d 777, 779 (8th Cir. 1995)). RFC is defined as the most that a claimant can still do in a work setting despite that claimant's limitations. 20 C.F.R. § 416.945(a)(1).

---

[2]The <u>Polaski</u> factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984).

Here, the Defendant correctly notes that the ALJ did support the RFC determination with medical evidence and other evidence in the record. The ALJ considered Plaintiff's testimony and discussed Plaintiff's lack of credibility in light of her daily activities. (Tr. 16) For instance, as stated above, Plaintiff was able to shop for sixty to ninety minutes at a time and was able to drive. "The issue in credibility determination is not whether the claimant actually experiences pain, but whether the claimant's symptoms are credible to the extent that they preclude all substantial gainful activity." Lewis v. Astrue, No. 4:10CV1131 FRB, 2011 WL 4407728, at *20 (E.D. Mo. Sept. 22, 2011) (citing Baker v. Apfel, 159 F.3d 1140, 1145 (8th Cir. 1998)). "The mere fact that working may cause pain or discomfort does not mandate a finding of disability . . . ." Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000) (citation omitted). Additionally, Plaintiff alleged that she had fibromyalgia and degenerative lumbar disease since 2003 yet was able to work with those conditions. Working, even on a part-time basis, generally demonstrates an ability to perform substantial gainful activity. Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005).

The ALJ also noted inconsistencies between Plaintiff's testimony of difficulty adapting to changes in routine, problems getting along with supervisors, and forgetfulness, and Plaintiff's allegations in disability reports. For instance, Plaintiff reported that she had no problem getting along with others, including authority figures, and that she handled changes in routine okay. (Tr. 269) Further, she did not need reminders to take medication or take care of personal needs. (Tr. 265) While she alleged her medications caused her to lose her train of thought, Plaintiff never reported this side effect to her physicians. In short, the ALJ properly discounted Plaintiff's credibility in evaluating her subjective complaints, and the inconsistencies between her subjective complaints and her daily activities and other evidence in the record support the ALJ's credibility

determination.  See Johnston v. Apfel, 210 F.3d 870, 875 (8th Cir. 2000) (finding that the ALJ properly discounted the plaintiff's credibility where the plaintiff had not reported side effects to doctors and was able to handle finances, do some cooking and housekeeping, and engage in reading and watching TV).

Plaintiff also argues that the ALJ failed to give full credit to the opinion of Dr. Long, the consulting psychologist.  "It is well settled that an ALJ may consider the opinion of an independent medical advisor as one factor in determining the nature and severity of a claimant's impairment." Harris v. Barnhart, 356 F.3d 926, 931 (8th Cir. 2004).  However, "the report of a consulting physician who examined a claimant once does not constitute 'substantial evidence' upon the record as a whole, especially when contradicted by the evaluation of the claimant's treating physician." Cantrell v. Apfel, 231 F.3d 1104, 1107 (8th Cir. 2000) (internal quotations and citations omitted).

Here, contrary to Plaintiff's assertion, the ALJ did consider and credit Dr. Long's opinion to the extent it was consistent with the medical evidence and with Plaintiff's testimony.  The ALJ limited Plaintiff's RFC to only simple instructions and non-detailed tasks.  However, the ALJ found unpersuasive Dr. Long's opinion that Plaintiff had marked limitations in interacting appropriately with supervisors, co-workers, and the general public, as well as in responding appropriately to usual work situations and changes in a routine work setting.  The ALJ correctly noted that psychiatric exams conducted by Dr. Kevin Coleman on several occasions showed appropriate affect and mood, with no signs of undue depression, anxiety, or agitation.  (Tr. 1106, 1216, 1218, 1226, 1233, 1237)  Additionally, Plaintiff reported that she had no problems getting

along with co-workers or supervisors, except for a disrespectful attitude toward younger supervisors. (Tr. 86)

Indeed, the MMPI-2 results showed some depression and anxiety, as well as unsociable behavior. (Tr. 1137) While the ALJ discounted Dr. Long's opinion that Plaintiff had "marked" limitations in her ability to interact with others, the ALJ did include the limitation of casual and infrequent contact with others in the RFC determination. (Tr. 14) These limitations demonstrate that the ALJ gave some credit to Dr. Long's opinion, where those opinions were supported by the objective evidence, the MMPI-2 in this case. Choate v. Barnhart, 457 F.3d 865, 870 (8th Cir. 2006). "The ALJ thoroughly discussed the medical records before outlining his RFC determination, which [this Court] conclude[s] is supported by substantial evidence." Gaston v. Astrue, 276 F. App'x 536, 537 (8th Cir. 2008). Therefore, substantial evidence supports the ALJ's RFC determination, and the decision of the Commissioner should be affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**. A separate Judgment in accordance with this Memorandum and Order is entered this same date.


/s/ Terry I. Adelman            
UNITED STATES MAGISTRATE JUDGE

Dated this 20th day of September, 2013.